UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTHONY WASHINGTON,

                            Plaintiff,

                                                                          DECISION AND ORDER

                                                                          11-CV-6176L

                  v.

CHAPLAIN M. AFIFY, et al.,

                            Defendants.
_____

       Anthony Washington, appearing *pro se*, commenced this action under 42 U.S.C. § 1983. Plaintiff, who was formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), has sued sixteen defendants, all of whom were, at all relevant times, DOCS employees at Southport Correctional Facility, where plaintiff was confined at the time of the events giving rise to this lawsuit.[1] Defendants have moved to dismiss the complaint Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**BACKGROUND**

       Plaintiff alleges a wide variety of claims arising out of incidents over a period of several months in 2008. He has sued defendants identified in the complaint as Chaplain M. Afify, Superintendent David Napoli, Deputy Superintendent J. Colvin, Correctional Counselor K.

---

[1] DOCS has since merged with the New York State Division of Parole to become the Department of Corrections and Community Supervision ("DOCCS"). *See* http://www.doccs.ny.gov/FactSheets/DOCS-Parole-Merger.html. Since the events giving rise to this lawsuit took place prior to that merger, "DOCS" will be used throughout this Decision and Order.

McCarthy, Lieutenant Donahue, Sergeant B. Curren, Sergeant Sepiol, Sergeant Post, and Correctional Officers S. Evertts, S. Waters, R. Deming, W. Faucett, W. Hollenbeck, J. K. Moss, Jayne, and Delaney.

Plaintiff's claims and allegations can be broken down into several categories, a summary of which will suffice here, although further details of the claims will be discussed as necessary below. First, plaintiff alleges that several defendants violated his Eighth Amendment right to be free from cruel and unusual punishment, by ordering plaintiff to clean up human feces without giving him the proper equipment to enable him to do so safely. He also asserts an Eighth Amendment claim against defendant Jayne for kicking plaintiff during a strip search.

Plaintiff also alleges that his right to the free exercise of his religion under the First Amendment to the United States Constitution has been violated in a number of respects. He alleges that defendants have, in various ways, either prevented or hindered him from practicing his Muslim faith, and that they have punished him for doing so by insisting that he work in the mess hall as a condition of his receiving meals that accorded with the requirements of his Muslim faith.

Plaintiff further asserts equal protection claims against most of the defendants, alleging that in committing these violations of his rights, defendants singled him out from among the other inmates. He has also alleged that defendants retaliated against him for his filing of grievances with respect to some of these events. Plaintiff also brings claims against some defendants based on allegations of due process violations, and based on a theory of supervisory liability for their failure to remedy all these alleged violations.

## DISCUSSION

### I. Eighth Amendment Claims

Plaintiff's claims under the Eighth Amendment mostly arise from his allegations that he was ordered to clean up feces without having received proper training and supplies.

Forcing a prisoner to come into contact with human waste can give rise to an Eighth Amendment claim. *See, e.g., Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) ("We are unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an [inmate's living] area to remain filled with sewage and excrement for days on end").

In the case at bar, however, plaintiff apparently never did clean the feces as he was ordered to. Apparently there were two separate incidents in which defendants ordered plaintiff to clean feces, on March 14, 2008 and on August 16, 2008. Plaintiff alleges that on both occasions, he refused to comply with those orders because he had not been given proper cleaning equipment. *See* Complaint ¶¶ 31, 55. Plaintiff alleges that he was retaliated against for those refusals, and those allegations are addressed later in this Decision and Order, but it is plain from plaintiff's own allegations that he never actually suffered any cognizable injury–not even a serious risk of harm–that would support an Eighth Amendment claim. *See Hall v. New York*, 2012 WL 1003765, at *2 n.1 (2d Cir. Mar. 27, 2012) ("the fact that Hall was never actually injured ... is ... highly relevant to the Eighth Amendment analysis"). *See also Richmond v. Settles*, 450 Fed.Appx. 448, 453 (6th Cir. 2011) (prisoner must "demonstrate actual physical injury to recover for violations of his Eighth Amendment rights") (citing 42 U.S.C. § 1997e(e)).

There is some authority that exposing a prisoner to a substantial risk of imminent, serious harm to his health or safety can support an Eighth Amendment claim, even in the absence of any actual physical harm. *See, e.g., Smith v. Peters*, 631 F.3d 418, 421 (7th Cir.2011) (stating that "[p]rison officials who recklessly expose a prisoner to a substantial risk of a serious physical injury violate his Eighth Amendment rights," but noting that certain remedies are barred by 42 U.S.C. § 1997e)(e)); *Harris v. Matthews*, 417 Fed.Appx. 758, 763 (10th Cir. 2011) ("While an idle threat of impending physical harm that is not carried out will not suffice to state an Eighth Amendment claim, an imminent threat of serious harm, even though injury never actually occurs, will suffice") (quoting *Purkey v. Green*, 28 Fed.Appx. 736, 745 (10th Cir. 2001)).

In the case at bar, however, things never reached that point. Plaintiff was directed to clean an area that had been contaminated with feces, and he refused. From the allegations of the complaint, plaintiff never even came close to actually being directly exposed to any noxious or harmful substances. *See Wesolowski v. Kamas*, 590 F.Supp.2d 431, 434 (W.D.N.Y. 2008) (plaintiff's allegations that he was not given adequate supplies to clean his cell, that his cell was not adequately cleaned after toilet overflowed, and similar allegations, failed to state Eighth Amendment claim, as they "represent[ed] minor inconveniences of prison life which 'are part of the penalty that criminal offenders pay for their offenses against society'") (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985) (additional internal quotes omitted), *aff'd*, 409 Fed.Appx. 476 (2d Cir. 2011).

Plaintiff does not seek injunctive or declaratory relief (nor do his allegations supply any basis for such relief), and although there is authority that punitive damages may be recoverable even absent actual physical injury, *see Smith*, 631 F.3d at 421, the threatened harm here was too remote to support such an award. *See Reynolds v. Barrett*, 741 F.Supp.2d 416, 446 (W.D.N.Y. 2010) ("There is no allegation, much less evidence, here that plaintiffs sustained any physical injury as a result of the events giving rise to their claims"); *Abney v. Jopp*, 655 F.Supp.2d 231, 233 (W.D.N.Y. 2009) (recognizing that "[s]ection 1997e(e) does not limit the availability of nominal damages for the violation of a constitutional right or of punitive damages," but stating that "[a]t the very least, a plaintiff must show that the defendant's actions gave rise to an excessive risk to the inmate's safety") (internal quote omitted).

Plaintiff's complaint contains several other allegations that could be construed as asserting Eighth Amendment claims, but they fail to support such a claim. He alleges, for example, that on one occasion, defendant Hollenbeck "threw a punch at [plaintiff's] face," Complaint ¶ 7, but there is no indication that Hollenbeck did hit plaintiff, and it appears that this amounted to no more than a threatened use of force. *See Felder v. Filion*, 368 Fed.Appx. 253, 256 (2d Cir. 2010) (allegation that correction officer threatened inmate plaintiff was not a sufficient basis for a claim of Eighth Amendment violation, because plaintiff did not present evidence of any injury resulting from those

threats); *Justice v. McGovern*, No. 11–CV–5076, 2012 WL 2155275, at *3 (E.D.N.Y. June 12, 2012) ("Courts in the Second Circuit have consistently held that mere threats ... without any injury or damage, are not actionable under Section 1983") (internal alterations and quotation marks omitted).

Plaintiff also alleges that during a strip search, defendant Jayne "kicked [him] after telling [plaintiff] to bend over and spread [his] butt cheeks." Complaint ¶ 90. Plaintiff does not allege that the kick was particularly forceful or that it caused him any pain or injury, and this *de minimis* use of force is not enough to support an Eighth Amendment claim. *See Bhuiyan v. Wright*, No. 06-CV-409, 2011 WL 1870235, at *8 (N.D.N.Y. May 13, 2011); *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460, 471 (S.D.N.Y. 1998).

**II. Religion Claims**

**A. Cell Assignment**

Plaintiff alleges that his ability to practice his religion was burdened in several ways. He alleges that in April and August 2008, respectively, he was transferred to a cell, and that another inmate was transferred to his cell, as a result of which he was forced to be exposed to pornographic images (presumably displayed by his cellmate), as well as to television programs and music, much of which contained "all kinds of profanity and sexually explicit content ... ." Complaint ¶ 20. Plaintiff alleges that these "distractions" prevented him from reciting his daily prayers "with the required humility, submission, tranquility and focus ... ." Complaint ¶ 21.

"[T]hose courts confronted with the question of whether inmates have a constitutional right to choose a cellmate have held that no such right exists." *Murray v. Bledsoe*, 650 F.3d 246, 247 (3d Cir. 2011) (citing *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984), and *Cole v. Benson*, 760 F.2d 226, 227 (8th Cir. 1985) (per curiam)). *See also Drayton v. Cohen*, No. CA 2:10–3171, 2012 WL 666839, at *6 (D.S.C. Feb. 29, 2012) ("For obvious reasons, courts have widely rejected any notion that a prisoner has any constitutional right to choose his cellmate"), *aff'd*, 474 Fed.Appx. 991 (4th Cir. 2012).

Courts have also rejected claims based on cell, or cellmate, assignments even where the assignment allegedly had an adverse effect on the inmate's ability to practice his religion. For example, in *Ochs v. Thalacker*, 90 F.3d 293, 296-97 (8th Cir. 1996), the Eighth Circuit held that state prison "officials properly rejected Ochs's request for racially segregated living quarters *even if* that substantially burdened his sincerely held religious beliefs," since the defendants' decisions as to cell assignments implicated institutional security, and "allowing such exceptions would create serious administrative and security problems." (Emphasis added.)

Similarly, in *Jones v. Goord*, 435 F.Supp.2d 221 (S.D.N.Y. 2006), Muslim inmates brought a claim asserting that the defendants' policy of double-celling prevented them from practicing their religion because, *inter alia*, "a cellmate may render a cell unclean and therefore unfit for prayer ... ." *Id.* at 257. The court held that the claim failed as a matter of law, since the double-celling policy was rationally related to legitimate institutional concerns, and plaintiffs had failed to show that the policy was unreasonable. *Id. See also Tate v. Jones*, No. 85-2646, 1986 WL 182, at *1 (E.D.Pa. Apr. 8, 1986) (assignment of plaintiff, a Sunni Muslim, with cellmate who posted pornographic images on the cell walls, which allegedly made it impossible for plaintiff to pray properly, did not give rise to a constitutional deprivation based on physical altercation between plaintiff and his cellmate, where fight broke out when plaintiff started pulling down his cellmate's pictures, and prison official's conduct simply could not be said to be the gross negligence which would support a § 1983 action for either cruel and unusual punishment or violation of plaintiff's due process rights). I therefore conclude that plaintiff's allegations concerning his cell or cellmate assignment fail to state a cognizable claim under the Free Exercise Clause of the First Amendment.

**B. "Religious" Meals and Attendance at Services**

Plaintiff alleges that he was denied "religious" meals during the Muslim holy month of Ramadan unless he agreed to work in the mess hall. Complaint ¶ 75. Plaintiff states that he "was denied two religious breakfast meal [sic] and one evening meal" because of his refusal to sign a form

indicating his assent to work in the mess hall. Complaint ¶ 72. It appears that plaintiff did thereafter receive his meals, as he states that he was "compelled to sign the form [indicating his willingness to work in the mess hall]," Complaint ¶ 76.

Plaintiff further alleges that defendant Deputy Superintendent Colvin denied his request to attend religious services because he had received three misbehavior reports in the past six months. Complaint ¶ 85. He states that he was not allowed to attend Friday services and apparently other services in connection with Ramadan from about September 18 to October 28, 2008, when he was transferred to a different facility. Complaint ¶¶ 85, 86.

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estates of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted). At the same time, however, those protections are not as extensive as the rights enjoyed by an ordinary citizen. Rather, "[a] prison inmate ... retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995)). *See also Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, ... are the interests of prison officials charged with complex duties arising from administration of the penal system") (internal quotation marks and brackets omitted).

In determining whether a restriction on a prisoner's religious practices passes muster under the First Amendment, "[t]he governing standard is one of reasonableness ... ." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). *See also Ford*, 352 F.3d at 588 ("The free exercise claims of prisoners are therefore judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights") (additional internal quotation marks omitted). The Second Circuit has stated that "[u]nder the First Amendment, ... a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion

if that policy 'is reasonably related to legitimate penological interests.'" *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)).

The test for ascertaining the constitutional validity of a particular policy or rule was established in *Turner v. Safley*, 482 U.S. 78 (1987). As the Second Circuit has explained:

> In *Turner*, the Supreme Court instructed that courts reviewing the validity of prison regulations should apply several factors. First, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Second, courts should assess "whether there are alternative means of exercising the right that remain open to prison inmates." Third, courts should consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Finally, courts should consider the challenged regulation in relation to proposed alternatives.

*Johnson v. Goord*, 445 F.3d 532, 535 (2d Cir. 2006) (citations omitted) (quoting *Turner*, 482 U.S. at 89-90). "Although the *Turner* test was articulated in the context of challenges to prison regulations, as opposed to challenges to individual conduct, the analysis in the later context is the same." *Heleva v. Kramer*, 214 Fed.Appx. 244, 246 n.1 (3d Cir. 2007) (citing *Ford*, 352 F.3d at 595 n.15). *See also Salahuddin v. Goord*, 467 F.3d 263, 276 n.4 (2d Cir. 2006) ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise") (citing *Ford*).[2]

As to plaintiff's allegations concerning his religious meals, I conclude that plaintiff's allegations are insufficient to state a facially valid First Amendment claim. Although there may be situations in which an ongoing or repeated failure to provide meals that conform to a prisoner's

---

[2]In their brief, defendants also cites authority that plaintiff must show that defendants' conduct has "substantially burdened" his practice of his faith. *See Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006). Whether a "substantial burden" requirement applies to First Amendment free-exercise cases appears to remain an open question in this circuit, however. *See id.* at 275 n.5 (mentioning substantial-burden requirement, but finding it unnecessary to address plaintiff's argument that it did not apply to his First Amendment claim); *McMichael v. Pallito*, No. 1:09–CV–130, 2011 WL 6012173, at *3 n.4 (D.Vt. Oct. 24, 2011) (noting that "[t]he Second Circuit has applied the 'substantial burden' test in its most recent prison free exercise cases, though it has explicitly refused to adopt or endorse the test"). Because I would reach the same result in this case whether I apply that test or not, I also find it unnecessary to decide this issue.

religious beliefs can give rise to a First Amendment violation, the allegations here show at most a *de minimis* burden on plaintiff's exercise of his religion.

Courts have generally held that incidents that are isolated, or few in number, involving a denial of religiously-mandated food, do not give rise to a First Amendment claim. *See, e.g., Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) (allegations of isolated, negligent acts with respect to prisoner's receipt of a kosher diet did not state a First Amendment claim); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (unavailability of pork-free meals on three out of 810 occasions constituted only a *de minimis* burden on prisoner's religion and did not violate Free Exercise Clause); *Wilson v. Woodbourne Correctional Facility*, No. 9:11–CV–1088, 2012 WL 1377615, at *3 (N.D.N.Y. Mar. 21, 2012) (collecting cases). *Cf. Lovelace v. Lee*, 472 F.3d 174, 187-89 (4th Cir. 2006) (concluding that a prisoner's religious exercise rights were substantially burdened when a disciplinary policy excluded him from special Ramadan meals during nearly the entire duration of the holy month).[3]

While courts are understandably loath to pass judgment on the sincerity of an individual's religious beliefs, *see Ford*, 352 F.3d at 588 ("Whether or not brought by prisoners, free exercise claims often test the boundaries of the judiciary's competence, as courts are 'singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs'") (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)), plaintiff has alleged no facts to suggest that this brief deprivation was significant enough to more than minimally burden his religious practice.

---

[3]The Second Circuit did hold in *Ford*, 352 F.3d 582, that the district court erred in granting summary judgment for the defendant DOCS officials on the inmate plaintiff's Free Exercise claim based on the defendants' denial of a single meal. In so ruling, however, the court pointed out that the meal in question was not just an ordinary daily meal, but a once-a-year feast marking the end of Ramadan. There was evidence from both the plaintiff and DOCS religious authorities that this was a holiday of great religious significance, that the feast was an integral part of the holiday, and that the plaintiff sincerely believed that the feast was critical to the practice of his faith. *Id.* at 594. The court stated that the feast was thus "sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a de minimis burden." *Id.* at 594 n.12 (citing *Rapier*, 172 F.3d at 1006 n.4).

In addition, as a practical matter the actual "burden" here on plaintiff was the requirement that he agree to work in the mess hall as a condition of receiving his religious meals. This is not a case in which defendants imposed such onerous conditions on plaintiff's receipt of religious meals that he would have to accept what amounted to a punishment in order to receive such meals. *Cf. Shilling v. Crawford*, 536 F.Supp.2d 1227, 1233 (D.Nev. 2008) (defendants' offer to plaintiff of the choice of transferring to a higher security facility and receiving kosher meals, or remaining at a lower security facility with no kosher meals constituted a substantial burden on plaintiff's religious exercise, since a transfer from a medium to a maximum security facility would mean giving up some of plaintiff's possessions and a loss of privileges), *aff'd*, 377 Fed.Appx. 702 (9th Cir. 2010). Plaintiff has not alleged that his refusal to work in the mess hall was religiously motivated, and he had no freestanding right to refuse to work at a prison job. *See Wolters v. Federal Bureau of Prisons*, 352 Fed.Appx. 926, 928 (5th Cir. 2009) (stating that "inmates do not have a constitutional right to refuse to work and refusing to work is not the exercise of a specific constitutional right").

As to plaintiff's allegation that he was not allowed to attend religious services, courts have held that inmates do have some right to participate in congregational services, and indeed DOCS Directive 4202 recognizes as much, stating that "[t]o the extent possible and consistent with the safety and security of the facility, authorized inmates shall be permitted ... to observe their congregational worship services ... ." DOCS Directive 4202 § F(2)(a).

Like many inmate rights, however, this right must be balanced against legitimate penological concerns. In *Smith v. Artus*, No. 07-CV-1150, 2010 WL 3910086 (N.D.N.Y. Sept. 30, 2010), the court, though recognizing that "a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock," *id.* at *21, granted summary judgment for the defendants on the plaintiff's claim challenging a directive that SHU inmates could not attend congregate religious services, finding that the directive had valid, rational

connection to the legitimate penological interest of security, staffing, and the preservation of scarce fiscal resources. *Id.* at *31.[4]

Plaintiff has alleged no facts that would materially distinguish this case from *Smith*, and for essentially the same reasons stated in that decision, I find that plaintiff has failed to state a valid claim here. Although *Smith* was decided on a motion for summary judgment, plaintiff must still allege facts that, if true, would support a verdict in his favor, and he has not done so. Defendants' motion to dismiss this claim is therefore granted.[5]

### III. Equal Protection Claims

Plaintiff also asserts claims under the Equal Protection Clause of the Fourteenth Amendment, based on several events. One of those events is defendants' ordering plaintiff to clean up feces.

---

[4]On appeal, the Second Circuit vacated the district court's decision on other grounds, stating that the portion of the district court's decision addressing the religious-services issue "remain[s] undisturbed by this order." 2013 WL 1338359, at n.1 (2d Cir. Apr. 4, 2013).

[5]The Court has also considered whether plaintiff has alleged facts that could support a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq. See Norfleet v. Walker*, ___ F.3d ___, 2012 WL 2520465, at *1 (7th Cir. 2012) ("courts are supposed to analyze a litigant's claims and not just the legal theories that he propounds, especially when he is litigating pro se") (citations omitted); *see also Crossman v. Crosson*, 101 F.3d 684, 1996 WL 280096, at *2 (2d Cir. 1996) ("even where a *pro se* plaintiff confuses various legal theories, it may be appropriate for the court to scrutinize the complaint to determine whether the facts alleged would support a different theory") (unreported case).

I do not believe that plaintiff has done so. The only relief that plaintiff seeks here is compensatory and punitive damages, which are not available under RLUIPA. *See Copeland v. Livingston*, 464 Fed.Appx. 326, 330 (5th Cir. 2012) ("RLUIPA does not create a private right of action against individuals for damages"); *accord Sharp v. Johnson*, 669 F.3d 144, 154 (3d Cir.), *cert. denied*, ___ U.S. ___, 133 S.Ct. 41 (2012). *See also Parks v. Smith*, No. 08-CV-0586, 2011 WL 4055415, at *10 (N.D.N.Y. Mar. 29, 2011) (although "[t]he Second Circuit has not resolved the issue[, t]he consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages"), *aff'd*, 505 Fed.Appx. 42 (2d Cir. 2012).

Plaintiff has not requested equitable relief, nor does it appear that he could be granted such relief, since according to the complaint, the alleged deprivation of attendance at religious services only lasted up until plaintiff's transfer to another facility, *see* Complaint ¶ 86, and plaintiff has apparently since been released from custody; his most recent submission (Dkt. #11) gives a street address in Binghamton, New York, and the DOCS Inmate Lookup Service, http://nysdoccslookup.doccs.ny.gov, shows that he was released in April 2011.

Plaintiff alleges that he was "singled out" in that regard and that similarly situated inmates were not given such orders.

To state an equal protection claim, a plaintiff must allege that he was intentionally treated differently from other similarly-situated individuals, either because of his membership in a protected class, or without any rational basis. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). Plaintiff has not identified any similarly situated individuals who were treated differently, however, *see King v. New York State Div. of Parole*, 260 Fed.Appx. 375, 379-80 (2d Cir.) (affirming dismissal of habeas corpus petition where petitioner "failed to identify a single individual with whom he can be compared for Equal Protection purposes"), *cert. denied*, ___ U.S. ___, 129 S.Ct. 294 (2008).

There is also nothing in plaintiff's allegations that would support a finding that he was treated differently based on any protected characteristic. Though he has asserted claims based on his religion, the facts alleged do not suggest that he was treated differently, regarding these matters, because of his Muslim faith. If anything, plaintiff's allegations suggest that defendants sought to retaliate against plaintiff because of his grievances; that claim is addressed below. But though an individual can be "singled out" for retaliatory treatment, that is a separate claim from an equal protection claim, and plaintiff's allegations are more properly addressed in the context of his retaliation claims. *See White v. Johnson*, No. 12-cv-623, 2012 WL 2884829, at *3 (S.D.Ill. July 13, 2012) (dismissing "Plaintiff's claim of an equal protection violation [that] merely duplicate[d] his claim of retaliation"); *Frisenda v. Incorporated Village of Malverne*, 775 F.Supp.2d 486, 518 (E.D.N.Y. 2011) ("to the extent that plaintiff also may be attempting to assert an equal protection claim based upon retaliation for First Amendment activity ..., such a claim is completely duplicative of the First Amendment retaliation claim and, therefore, should not go forward")

Plaintiff also asserts an equal protection claim based on his transfer to a different cell, and based on a program change, from a job in the law library to a job as a porter. Again, based on plaintiff's factual allegations, those claims more properly fall under plaintiff's retaliation theory. Plaintiff does not allege facts suggesting that his cell transfer or program change was in any way

based on his religion, or any other protected characteristic; to the extent that plaintiff was treated differently from any other inmate, that difference in treatment was allegedly due only to his having filed grievances and complained about various matters. That does not give rise to an equal protection claim. *Id.*

## IV. Due Process Claims

Plaintiff asserts that his due process rights were violated when, after he refused an order to clean feces on August 16, 2008, he was charged by defendants Waters and Faucett with disobeying a direct order, and defendant Donahue subsequently found him guilty after "an unfair and biased disciplinary hearing ... ." Complaint ¶ 79. Plaintiff also alleges that "Donahue maliciously delayed the hearing for 30 days," during which time plaintiff remained in keeplock, and then imposed the maximum penalty of thirty days keeplock, but without credit for time served, so that plaintiff ended up serving sixty days in keeplock.

Claims of hearing officer bias are common in § 1983 cases by inmate plaintiffs, and where they are based on purely conclusory allegations, they are routinely dismissed. *See*, *e.g., Vogelfang v. New York State Dep't of Corrections*, No. 10 CIV 3827, 2010 WL 3895493, at *1 (S.D.N.Y. Oct. 4, 2010); *Madison v. Grecco*, No. 08-CV-1125, 2010 WL 935582, at *5 (N.D.N.Y. Feb. 19, 2010); *Torres v. Selsky*, No. 02CV0527, 2005 WL 948816, at *9 (N.D.N.Y. Apr. 25, 2005).

In the case at bar, however, plaintiff does more than simply allege that Donahue was biased. He alleges that at the end of the hearing, Donahue called plaintiff "a little monkey," and told plaintiff that there was "more retaliation on the way," and that "they were not done yet." Complaint ¶ 82.

Although the Second Circuit has stated that "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally," *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989), that does not mean that there are no constraints on hearing officers in that regard. In *Francis*, the Second Circuit explained that "it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be

adjudged of sufficient magnitude to violate due process," but the court went on to find that the plaintiff's allegations that his hearing officer had prejudged his guilt were sufficiently supported by the record to withstand the hearing officer's motion for summary judgment based on the claim of qualified immunity. *Id. See also Torres v. Selsky*, No. 02CV0527, 2005 WL 948816, at *9 (N.D.N.Y. Apr. 25, 2005) ("Undeniably, the due process guarantees afforded under the Fourteenth Amendment extend to require that the hearing officer designated to preside over a prison disciplinary hearing be impartial") (citing *Francis*, 891 F.2d at 46-47).

Defendants correctly note that due process requires only that "some evidence" support a hearing officer's finding of guilt. *See Livingston v. Kelly*, 423 Fed.Appx. 37, 40 (2d Cir. 2011); *Peoples v. Fischer*, No. 11 CIV. 2694, 2012 WL 1575302, at *7 (S.D.N.Y. May 3, 2012), but that is the standard applicable to a claim of insufficiency of the evidence. That is a related, but nevertheless separate, issue from the issue of hearing officer bias. *See Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (due process accorded an inmate at a disciplinary hearing requires, *inter alia*, "that a hearing disposition must be supported by at least some evidence," *and* "a fair and impartial hearing officer") (internal quotation marks omitted).

On a motion to dismiss under Rule 12(b)(6), the court must assume the truth of plaintiff's factual allegations. *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 105 n.4 (2d Cir. 2012). Assuming that Donahue did make the statements in question, those statements would be some evidence of actual bias against plaintiff. *See Phelan v. Cook County*, 463 F.3d 773, 782 (7th Cir. 2006) (evidence of discrimination toward plaintiff employee, including evidence that hearing officer made discriminatory comments to her before ultimately acting as the person who would conclude she should be terminated, was sufficient to defeat defendants' motion for summary judgment); *Reynolds v. Barrett*, 741 F.Supp.2d 416, 442 (W.D.N.Y. 2010) (defendant's alleged reference to Ponder as a "monkey" was "some evidence of racial animus on his part"); *Tawwaab v. Virginia Linen Service, Inc.*, 729 F.Supp.2d 757, 779, 2010 WL 3000801,

at *14 (D.Md. July 28, 2010) ("courts have repeatedly held that comparing an African-American to a monkey is a particularly severe and egregious practice").

It is certainly possible that on a more complete record, Donahue could be entitled to summary judgment, even if he did use the term "monkey." *See*, *e.g.*, *Ross v. Pfizer, Inc.*, 375 Fed. Appx. 450, 454 (6th Cir.) (finding that an employer's use of the word "monkey" toward an African American employee was not direct evidence of racial discrimination, when "monkey" was used in the context of the monkey-on-the-back idiom), *cert. denied*, __ U.S. __, 131 S.Ct. 508 (2010). But based on the allegations before me, I find that plaintiff has at least stated a facially valid due process claim against Donahue.

**V. Retaliation Claims**

Plaintiff alleges that virtually every act of which he complains was taken for retaliatory reasons, mostly because he had filed grievances about prior events. In evaluating these claims, the Court is mindful of the Second Circuit's admonition that district courts should approach prisoner retaliation claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, (2002). As this Court has observed in the past, "[i]t is all too easy for prisoners to fabricate such claims ... ." *Taylor v. Fischer*, 841 F.Supp.2d 734, 738 (W.D.N.Y. 2012) (quoting *Green v. Herbert*, 677 F.Supp.2d 633, 637 (W.D.N.Y. 2010)).

"In order to prevail on a claim of unconstitutional retaliation, plaintiff must allege, and ultimately prove, that (1) he engaged in constitutionally protected speech or conduct, (2) defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action." *Taylor*, 841 F.Supp.2d at 737 (quoting *Dawes*, 239 F.3d at 492). Plaintiff has alleged that he engaged in protected activity, mostly in the form of filing grievances. *See Coleman v. Beale*, 636 F.Supp.2d 207, 211 (W.D.N.Y. 2009) ("It is well established that filing a

prison grievance is protected by the First Amendment's guarantee of the rights to free speech and to petition the government for a redress of grievances") (citing cases).

Where at least some of his claims falter, however, is on the two remaining prongs. As stated, plaintiff simply ascribes everything that he found objectionable to retaliation. Without enough supporting facts to make such allegations plausible, that is not enough. *See Muhammad v. Reeves*, No. 08-CV-182, 2012 WL 5617113, at *8 (W.D.N.Y. Nov. 15, 2012) ("Conclusory allegations of retaliation are not sufficient; the plaintiff must allege facts from which retaliation may plausibly be inferred") (internal quotation marks and alteration omitted).

Plaintiff does, however, allege sufficient facts to state a retaliation claim against some defendants. He alleges that defendant Evertts called plaintiff "nuts" for writing a certain grievance, that Evertts told plaintiff that plaintiff "was playing with the wrong one," and that the very next day, April 11, 2008, Evertts issued a false misbehavior report against him. Plaintiff states that he was found guilty on the charge and sentenced to thirty days of keeplock, and that this finding was later cited by a parole panel in denying plaintiff parole. Complaint ¶¶ 13-17.[6]

The close temporal proximity between Evertts' alleged veiled threats over plaintiff's grievance, and Evertts' filing of a misbehavior report against plaintiff, provides some support for plaintiff's claim of retaliation. *See Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) ("the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation"); *Webster v. Fischer*, 694 F.Supp.2d 163, 183 (W.D.N.Y.) ("closeness in time between protected activity and the issuance of a misbehavior report can sometimes give rise to an inference that the two are connected and suffice to defeat a summary

---

[6]While there is no due process right not to have parole decisions made on the basis of false information, absent an admission by the state that false information was used to deny parole, *see Wood v. Utah Bd. of Pardons & Parole*, 375 Fed.Appx. 871, 874 n.4 (10th Cir. 2010), I find that these allegations are sufficient to state a retaliation claim. *See Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).

judgment motion seeking dismissal of a retaliation claim") (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)), *aff'd*, 398 Fed.Appx. 683 (2d Cir. 2010).

The fact that plaintiff was found guilty certainly undercuts plaintiff's retaliation claim, but at the pleading stage, it does not defeat it. *See*, *e.g.*, *Rivera v. Lawrence*, No. 05-CV-0967, at *6-*7 (N.D.N.Y. June 18, 2009) (finding, though inmate's conviction had been affirmed on administrative review, that he had stated valid claim of retaliation based on issuance of misbehavior report that was issued eight days after plaintiff filed grievance and two days after he wrote a letter of complaint to defendant's captain); *see also Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) (stating that summary judgment on inmate's retaliation claim was inappropriate, and that if plaintiff could prove his allegation that he was subjected to false disciplinary charges and subsequent punishment for having engaged in protected conduct, he would be entitled to relief under section 1983).[7]

Plaintiff has also stated a facially valid retaliation claim against defendant Deming. Plaintiff alleges that on July 1, 2008, he filed a grievance against Deming for alleged harassment, and that on July 8, 2008, Deming entered plaintiff's cell and said to him, "You just don't get it. I'm going to beat the fucking tar off of you. I told you to keep my name out of your grievances. You wrote CORC [Central Office Review Committee] on me? Are you fucking crazy?" Complaint ¶ 43. Deming also allegedly told plaintiff that he would enlist other officers to "beat every bone in your body," adding, "Have you ever seen someone die in prison? ... You think this is a fucking joke?" *Id.*

Deming apparently did not make good on his threats to beat plaintiff, but he did allegedly write a false misbehavior report against plaintiff on September 17, 2008, two days after plaintiff had

---

[7]In *Franco*, the inmate's guilty finding was eventually ordered expunged in an Article 78 proceedings, after he had served his entire sentence. The Second Circuit did not rest its decision on that fact, however, and the state courts in the Article 78 proceeding ruled without issuing any written opinions, so it is not clear what the basis was for their rulings. *See Franco*, 854 F.2d at 585.

filed another grievance against Deming. Complaint ¶ 83. Plaintiff was found guilty on the underlying charge and sentenced to thirty days in keeplock. Complaint ¶ 84.

Plaintiff also alleges that on August 16, 2008, defendants Faucett and Waters directed him to go to B-Block, and that upon his arrival there, Faucett said to Waters, "Is this [*i.e.* plaintiff] the little monkey who likes filing grievances? We got some shit for you to clean monkey." Complaint ¶ 53. Waters allegedly echoed those remarks, saying to plaintiff, "You like calling c.o.'s KKK in grievances, nigger? Well, today we got some shit for you to clean. How do you feel about that?" Complaint ¶ 54. When plaintiff refused to clean the area in question without proper cleaning equipment and protective gear, defendants allegedly issued him a misbehavior report the following day, charging him with disobeying a direct order. Complaint ¶ 60. The outcome of that charge is not clear from the complaint.

As to the claims recited above, I find that plaintiff has alleged enough facts to survive a motion to dismiss. Those facts, if true, suggest that defendants took specific, concrete actions against plaintiff in retaliation for his exercise of his First Amendment rights. The fact that defendants' conduct apparently did not deter plaintiff from continuing to file grievances does not defeat these claims. *See Bilal v. White*, 494 Fed.Appx. 143, 147 (2d Cir. 2012) ("an inmate who claims retaliation for filing grievances need not show that defendants' conduct thereafter chilled his own exercise of rights") (citing *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004)).

Plaintiff's other retaliation claims must be dismissed, however. As to those claims, plaintiff has not alleged facts showing either that defendants took adverse action against him, or that they acted out of retaliatory motives. Except for the claims outlined above, then, plaintiff's other retaliation claims are dismissed.[8]

---

[8]Plaintiff also alleges that when he was transferred to a different facility in October 2008, defendants Post, Jayne and Delaney deliberately failed to transfer plaintiff's personal property to the receiving facility. Complaint § 89. Plaintiff appears to allege this only in support of his retaliation claims, and does not seem to assert a separate due process claim based on any loss of property. *See* Complaint ¶ 98. In any event, a due process claim would fail because "New York
(continued...)

## VI. Supervisory Liability

Plaintiff asserts claims against defendant Napoli based on a claim of supervisory liability. These claims are premised on Napoli's role as superintendent, which is not enough to establish his liability. *See Rivera v. Lempke*, 810 F.Supp.2d 572, 576 (W.D.N.Y.2011) ("there is no respondeat superior liability in § 1983 cases"). The fact that plaintiff's grievances were denied is not sufficient to demonstrate liability on Napoli's part. *See Henry v. Lempke*, 680 F.Supp.2d 461, 464 (W.D.N.Y. 2010) (denial of a prisoner's grievance is not enough to establish superintendent's personal involvement in alleged constitutional violation). There are no allegations showing that Napoli was directly involved in the alleged violations, and plaintiff's claims against Napoli are therefore dismissed.

## VII. Official-Capacity Claims

Plaintiff has sued all defendants both in their individual and official capacities. Plaintiff (who, as stated, has been released from custody, *see supra* n.5) does not seek injunctive relief, and thus there is no basis for any claims against defendants in their official capacities. All such claims are barred under the Eleventh Amendment to the United States Constitution, and are dismissed. *See O'Diah v. Artus*, 887 F.Supp.2d 497, 502-03 (W.D.N.Y. 2012); *Taylor v. Fischer*, 841 F.Supp.2d 734, 736-37 (W.D.N.Y. 2012).

---

[8](...continued)
provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates." *Nash v. McGinnis*, 585 F.Supp.2d 455, 461 (W.D.N.Y. 2008) (citing *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996)).

To the extent that plaintiff makes these allegations in support of his retaliation claims, such claims fail because plaintiff has not demonstrated a sufficiently concrete harm. He alleges that he did eventually receive nearly all his property, with the exception of some unspecified papers. Complaint ¶ 97. That is not enough to show an act likely to "chill a person of ordinary firmness from continuing to engage" in protected activity. *Dawes*, 239 F.3d at 493.

## CONCLUSION

Defendants' motion to dismiss the complaint (Dkt. #6) is granted in part and denied in part. All of plaintiff's claims are dismissed, with the exception of his due process claim against defendant Donahue, and his First Amendment retaliation claims against defendants Evertts, Deming, Faucett, and Waters.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
September 3, 2013.